UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------X

THOMAS DILLARD,                          :

                    Plaintiff,           :     13 Civ. 6279 (LTS)(HBP)

      -against-                          :     REPORT AND
                                               RECOMMENDATION
CAROLYN W. COLVIN, acting                :
Commissioner of Social Security,
                                         :
                    Defendant.           :
----------------------------------X


          PITMAN, United States Magistrate Judge:


          TO THE HONORABLE LAURA T. SWAIN, United States District

Judge,


I.   Introduction


          Plaintiff, Thomas Dillard, brings this action pursuant

to Section 205(g) of the Social Security Act (the "Act"), 42

U.S.C. § 405(g), seeking judicial review of a final decision of

the Commissioner of Social Security ("Commissioner") denying his

application for disability insurance benefits ("DIB").  Plaintiff

has moved for summary judgment under Rule 56(a) of the Federal

Rules of Civil Procedure (Notice of Motion, dated March 17, 2014

(Docket Item 12)).  The Commissioner has filed a cross-motion

seeking judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure (Notice of Motion, dated August 14, 2014 (Docket Item 20)).

For the reasons set forth below, I respectfully recommend that plaintiff's motion for summary judgment be denied and that the Commissioner's motion for judgment on the pleadings be granted.

II.  Facts

    A.  Procedural
       Background

Plaintiff filed an application for DIB on September 3, 2010, alleging that he had been disabled since April 30, 2009 (Tr.[1] 133-34).  The Social Security Administration ("SSA") denied plaintiff's application, finding that he was not disabled (see Tr. 92).  Plaintiff timely requested and was granted a hearing before an Administrative Law Judge ("ALJ") (see Tr. 29).  ALJ Robert Gonzalez conducted a hearing on December 1, 2011 (Tr. 29-70).  In a decision dated April 12, 2012, ALJ Gonzalez determined that plaintiff was not disabled within the meaning of the Act (Tr. 14-24).  The ALJ's decision became the final decision of the

---

[1]"Tr." refers to the administrative record that the Commissioner filed with her answer, pursuant to 42 U.S.C. § 405(g) (see Notice of Filing of Administrative Record, dated October 22, 2013 (Docket Item 8)).

Commissioner on July 3, 2013, when the Appeals Council denied plaintiff's request for review (Tr. 1-5).

Plaintiff commenced this action for review of the Commissioner's decision on September 6, 2013 (Complaint (Docket Item 1)). On March 17, 2014, plaintiff moved for summary judgment (Docket Item 12), and on August 14, 2014 the Commissioner cross-moved for judgment on the pleadings (Docket Item 20).

B.   Plaintiff's
     <u>Social Background</u>

Plaintiff was born August 13, 1966 and was 42 years old on the date of the onset of his alleged disability (Tr. 133). Plaintiff has a high school diploma and speaks English (<u>see</u> Tr. 33). He is married, and he and his wife, a New York City Policewoman, have three children who were one, three and four years old at the time of plaintiff's hearing (Tr. 35). Plaintiff and his family reside in Warwick, New York (Tr. 36). Plaintiff was employed as a bus driver for the Metropolitan Transit Authority ("MTA") for approximately ten years (Tr. 144). On April 30, 2009 he was assaulted by a passenger, sustaining stab wounds to his shoulder, forearm and back, and has not worked since that time (Tr. 160, 190). In December 2010, the MTA put plaintiff on "accidental disability retirement" (Tr. 34).

C.   Plaintiff's
     <u>Medical Background</u>[2]

Between the date of his assault and the date of the disability hearing, plaintiff saw more than thirteen different physicians.  As described in more detail below, only four of those physicians were treating sources who saw plaintiff regularly.  Plaintiff consulted with most of the physicians identified below for disability evaluation purposes.

1.   <u>Treating Physicians</u>

a.   <u>Dr. Xiao</u>

Dr. Jean Xiao treated plaintiff for his physical injuries from August 2009 through April 2011.  On August 10, 2009, about three months after the assault, plaintiff visited Dr. Xiao and reported pain in his back, neck, right shoulder and right forearm (Tr. 268).  Dr. Xiao ordered an MRI of plaintiff's cervical spine, and on August 19, 2009, Dr. Tuan Ha, a consulting radiologist, wrote that plaintiff's MRI revealed that he had

_____

[2] I recite only those facts relevant to my decision.  The administrative record more fully sets out plaintiff's medical history (Docket Item 8).

4

[d]iffuse disc osteophyte[3] complexes from C3-C4 to C7-T1, with bilateral uncovertebral hypertrophy.[4]  These findings are most severe at C5-6 and C6-7, where there is mild central stenosis[5] with minimal cord compression.  Multilevel neural foraminal[6] narrowing, including moderate to severe neural foraminal narrowing at C5-6 and C6-7[,] . . . [and] [n]onspecific straightening, with no fracture or spondylolisthesis[7]

(Tr. 195).  Dr. Xiao also ordered an MRI of plaintiff's lumbo-sacral spine, and on September 9, 2009, Dr. Daniel Resnick, a consulting radiologist, wrote that plaintiff's MRI showed that he had "[b]road based disc herniation with bilateral lateral recess and neural foraminal stenosis at L1-2, L4-5, and L5-S1[,] [a]nnular bulging with bilateral lateral recess and neural foraminal stenosis at L2-3 and L3-4[, and m]ild levoscoliosis[8]" (Tr. 196-97).

---

[3]An "osteophyte" is "a bony . . . outgrowth." Dorland's Illustrated Medical Dictionary, ("Dorland's") at 1200 (27th ed. 1998).

[4]"Hypertrophy" is "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." Dorland's at 800.

[5]"Stenosis" is the "narrowing or stricture of a duct or canal." Dorland's at 1579.

[6]A "neuroforamina" is an opening in the spinal column.  See Stedman's Medical Dictionary, at 756, 1307 (28th ed. 2006).

[7]"Spondylolisthesis" is the "forward displacement of one vertebra over another." Dorland's at 1567.

[8]"Levoscoliosis" is "an appreciable lateral deviation [to the left] in the normally straight vertical line of the spine." See Dorland's at 918, 1497.

On September 9, 2009, Dr. Xiao wrote that plaintiff had an internal derangement in his right shoulder, an internal derangement in his "arm/elbow," a "sprain/strain" of his neck and back and a sprain of an unspecified site of his shoulder or upper arm (Tr. 266). Dr. Xiao indicated that she believed plaintiff to be "temporar[il]y total[ly] disab[led]" (Tr. 266). Dr. Xiao's notes from October 26, 2009 state that plaintiff was prescribed Percocet, Flexeril and physical therapy (Tr. 294-95), and in December 2009 Dr. Xiao's notes indicate plaintiff had radicul-pathy[9] (Tr. 286-87).

From January 2010 through July 2010, Dr. Xiao wrote that plaintiff continued to take Percocet, was waiting to see a pain specialist and was undergoing physical therapy (Tr. 280-81 (January 2010), 278-79 (March 2010), 272-73 (April 2010), 292-93 (May 2010), 282-83 (June 2010), 276-77 (July 2010)). Treatment notes show that Dr. Xiao evaluated plaintiff's physical ability on August 11, 2010, writing that plaintiff could not lift, push, pull or carry more than ten pounds and could not climb, bend, kneel, reach, "handle," engage in repetitive motions, work near heights or operate machinery or vehicles (Tr. 284-85). She also wrote that plaintiff should not sit, stand or walk for prolonged

---

[9]"Radiculpathy" is a "disease of the nerve roots." Dorland's at 1405.

6

periods of time (Tr. 285).  Dr. Xiao noted that she found plain-
tiff to be "total[ly] disab[led]" at that time (Tr. 285).  Dr.
Xiao's notes indicate no new complaints from plaintiff in October
and December 2010 (Tr. 274-75 (October 2010), 378-79 (December
2010)).

On January 24, 2011, Dr. Xiao found plaintiff to be
only partially disabled (Tr. 380-81).  Treatment notes show that
on March 7, 2011, Dr. Xiao recommended that plaintiff see a
chiropractor and start an exercise program, and she raised the
limit on plaintiff's weight lifting from ten to fifteen pounds
(Tr. 382-83).  Dr. Xiao's last notes, dated April 4, 2011, do not
reflect anything further (Tr. 384-85).

In an opinion dated March 28, 2011, Dr. Xiao wrote that
plaintiff could only stand or walk in fifteen-minute increments
for a total of thirty minutes during an eight-hour day, and could
only sit in twenty-minute increments for a maximum of one hour
per day (Tr. 368-69).[10]

---

[10]Dr. Xiao does not state what plaintiff would be doing for
the remainder of the eight hours during which he could not walk,
sit or stand.

b.   Dr. Acuri

In August 2011, Dr. Zewditu Bekele Acuri ordered an MRI of plaintiff's back to determine if plaintiff suffered from lumbar disc disease (Tr. 419).  Dr. Acuri wrote that plaintiff had low back pain but the results of his examination were otherwise normal (Tr. 419).  On September 23, 2011, Dr. Acuri reviewed an MRI that indicated plaintiff had multilevel degenerative disc disease (see Tr. 426-27).  Dr. Acuri wrote that plaintiff's exam results were normal, plaintiff had no pain at that time, and he recommended that plaintiff not lift heavy items, maintain good posture and avoid sitting for long periods of time (Tr. 423).

c.   Dr. Rombom

Plaintiff saw Dr. Howard Rombom for a little more than a year, starting in August 2009.  Plaintiff's symptoms included depression, nightmares, flashbacks of the assault, difficulty sleeping and concentrating, loss of appetite, irritability, anger, hypervigilence and "anxiety in vehicle" (Tr. 202-04 (August 2009), 404-05 (October 2009), 402-03 (November 2009), 401 (January 2010), 400 (March 2010), 399 (June 2010), 398 (July 2010), 397 (August 2010), 396 (September 2010), 395 (October 2010)).  Dr. Rombom wrote that plaintiff had the signs and

8

symptoms of post-traumatic stress disorder ("PTSD") and a Global Assessment of Functioning ("GAF")[11] of 45,[12] but he found plaintiff had no evidence of any thought disorder (Tr. 202-04 (August 2009)).  During their treatment relationship, Dr. Rombom rated plaintiff's disability from a six to an eight on a scale of one to ten (Tr. 202-04, 400-05).  In January 2010, Dr. Rombom's notes indicate that plaintiff had started seeing a psychiatrist, Dr. Vilor Shpitalnik,[13] who prescribed Lexapro for plaintiff (Tr. 400).  In August 2010, Dr. Rombom wrote that "patient has been managing symptoms relative[ly] well, with the assistance of med[ication]s" (Tr. 397).

d.   Dr. Haberman

Plaintiff saw Dr. Maurice Haberman for two years for psychiatric treatment, beginning in June 2010 (Tr. 437).  The first treatment notes indicate that plaintiff was diagnosed with

---

[11]GAF rates the overall psychological functioning on a scale of 0 to 100 that takes into account psychological, social and occupational functioning.  Diagnostic and Statistical Manual of Mental Disorders, ("DSM-IV") at 32 (4th ed. rev. 2000).

[12]A GAF of 41-50 indicates "[s]erious symptoms . . . [or] any serious impairment in social, occupational, or school functioning."  DSM-IV at 32.

[13]A report from Dr. Shpitalnik's initial psychiatric evaluation of plaintiff on January 13, 2010 was submitted to the Appeals Council (Tr. 442-45).

PTSD (Tr. 437).  From August 2010 through December 2010, Dr. Haberman's treatment notes indicate that plaintiff's symptoms had diminished (Tr. 438 (August, September and October 2010), 439 (December 2010)).  In March 2011, Dr. Haberman's treatment notes report that plaintiff had returned from a three-month break in treatment and that while he had been stable on medication for that three-month period, he ran out of medication and started having trouble sleeping, and increased agitation, anger and irritability (Tr. 439).  In June 2011 and September 2011, Dr. Haberman reported that plaintiff was "overall euthymic[,] calm and stable on med[ication]s" (Tr. 439).  In November 2011, he reported that plaintiff had residual PTSD symptoms, but was sleeping twelve hours per night (Tr. 439).  On December 7, 2011, therapist Kiran Miner performed an intake exam for Dr. Haberman, and found that plaintiff's memory and concentration were intact but that he had a GAF of 60,[14] was depressed and had trust issues as a result of his assault (Tr. 407, 409).  In March 2012, Dr. Haberman reported that plaintiff had returned from another three-month break in treatment (Tr. 439).  In May 2012, he reported that plaintiff was still residually depressed (Tr. 439), but in June 2012 plaintiff's depression had decreased (Tr. 440).

---

[14]A GAF of 51-60 indicates "moderate difficulty in social, occupational, or school functioning."  DSM-IV at 32.

On November 30, 2011, Dr. Haberman completed a work abilities worksheet (Tr. 387-88).  He opined that plaintiff had "poor or [no]" ability to relate to co-workers, deal with the public, follow work rules, maintain concentration, deal with work stress, behave in an emotionally stable manner and relate predictably in social situations (Tr. 387-88); plaintiff had a "fair" ability to use judgment, interact with supervisors, understand, carry out, remember and complete detailed but non-complex job instructions, maintain personal appearance and demonstrate reliability; plaintiff had a "good" ability to function independently and understand, remember and carry out simple instructions (Tr. 387-88).  On December 6, 2011, Dr. Haberman wrote that plaintiff continued to have difficulty with the public (Tr. 407).  On December 8, 2011, Dr. Haberman wrote that plaintiff was less depressed, irritable and edgy and was sleeping better; however, he also wrote that plaintiff continued to be guarded and unable to concentrate and opined that plaintiff could no longer perform his work as a bus driver (Tr. 407).

2.   Consulting Physicians

a.   Physical Exams

Dr. Joseph Lopez completed a medical exam on May 22, 2009 (Tr. 261-63).  He examined plaintiff but did not review his medical record.  At that time Dr. Lopez noted that plaintiff had had knee surgery a few days prior and was using a cane to walk (Tr. 261-62).  Dr. Lopez found that plaintiff had decreased flexibility in his right shoulder and cervical spine (Tr. 262), and his impression was that plaintiff had a cervical strain, thoracic strain, a right shoulder strain and a left knee internal derangement (Tr. 263).  He opined that plaintiff could work, but could not perform twisting or climbing activities, could not lift, pull or push weight greater than ten pounds, and could not perform work involving heights or operating vehicles or mechanical equipment (Tr. 263).

Dr. Herbert Bessen examined plaintiff three times at the end of 2009.  On October 1, 2009, his description of plaintiff's work abilities was identical to that of Dr. Lopez (see Tr. 259, 263).  On November 5, 2009, Dr. Bessen noted that plaintiff reported that he was no longer taking medication for his arm or shoulder, but continued to take pain medication for his lower back (Tr. 254).  Dr. Bessen also increased the weight that he

12

believed plaintiff could lift, pull or push to twenty pounds (Tr.
255).  On December 3, 2009, Dr. Bessen reported that plaintiff
had regained full motion of his neck and had only a mild restric-
tion of internal and external range of motion of his right
shoulder (Tr. 247).  Dr. Bessen increased the weight that plain-
tiff could lift, pull or push to thirty pounds (Tr. 247).

Dr. Carl Wilson examined plaintiff on July 26, 2010
(221-24).  Dr. Wilson noted that plaintiff reported pain in his
neck, back and right shoulder (Tr. 222).  Plaintiff told Dr.
Wilson that his daily activities were physical therapy, psycho-
therapy, taking medications and relaxing and that he needed help
cleaning, cooking, shopping and driving (Tr. 223).  Dr. Wilson
diagnosed plaintiff's injuries from the assault as resolved, but
noted that plaintiff continued to have lumbosacral back pain from
a prior injury (Tr. 223).  He wrote that plaintiff had excellent
muscle mass and only mild stiffness in his shoulder (Tr. 223-24).
Dr. Wilson opined that plaintiff would have no work restrictions
except those resulting from the medication he was taking for back
pain (Tr. 223-24).

Dr. Suraj Malhotra examined plaintiff on December 14,
2010 and reported that plaintiff's daily activities consisted of
watching television, and that although plaintiff needed help
dressing, he was able to shower on his own (Tr. 331).  Plaintiff

reported that he helped his wife cook, clean, shop and do laundry, and that his wife and parents cared for his children (Tr. 331).  Dr. Malhotra found that plaintiff had no instability, intact sensation, and 5/5 strength in his right shoulder (Tr. 331-32).  Dr. Malhotra diagnosed plaintiff with remote right shoulder neuralgia,[15] and he diagnosed plaintiff, "by history," with herniation of an invertebral disc in the lumbosacral spine region (Tr. 332).  Dr. Malhotra opined that plaintiff had mild limitations in his ability to turn his neck, moderate limitations in his ability to raise his right arm above shoulder level, and moderate limitations in bending (Tr. 332).

Dr. Michael Hearns completed a form on August 15, 2011 in which he opined that plaintiff had back pain and cervicalgia[16] and was 80% temporarily disabled (Tr. 370-71).  Dr. Hearns appears to have examined plaintiff in June 2011 (Tr. 372-73).  His notes from that exam are largely illegible, but the only restrictions he indicated were on plaintiff's ability to lift, pull and push, although he also indicated that plaintiff had a "marked" disability (Tr. 373).  Notes from May 2011 appear to be

---

[15]"Neuralgia" is "pain which extends along the course of one or more nerves."  Dorland's at 1126.

[16]"Cervicalgia" is neck pain.  See Dorland's at 307, 1212.

substantially identical (Tr. 376-77).  There is no diagnostic
testing indicated on either set of notes.

　　　　　　　　b.　　Psychiatric Exams

　　　　　　Dr. Peter Sass examined plaintiff six times.  On
November 12, 2009, plaintiff reported to Dr. Sass that he had
difficulty sleeping and had nightmares and panic attacks a few
times per week (Tr. 250).  Plaintiff took a public bus to the
exam, but he reported feeling hypervigilent and anxious during
the fifteen-minute ride (Tr. 250).  Plaintiff reported anxiety
when he drove and that he was, therefore, limited to driving only
short distances (Tr. 251).  Plaintiff also reported irritable
mood, short temper, loss of appetite, decreased energy, weight
loss, social withdrawal and a lack of concentration and memory
(Tr. 251).  Plaintiff stated that his daily activities were
limited to sitting around the house, going to medical appoint-
ments and doing a little housework (Tr. 251).  Dr. Sass wrote
that plaintiff had PTSD, was experiencing a major depressive
episode and was totally disabled (Tr. 252).

　　　　　　On December 21, 2009, Dr. Sass reported that plaintiff
took a train and a bus to get to his appointment (Tr. 241).
Plaintiff reported that he did not take public transportation
except to attend his medical appointments, would go shopping if

15

accompanied by his wife (Tr. 242), spent his days at home, but was able to care for his children (Tr. 243).   Plaintiff also reported that he had stopped taking his psychiatric medications (Tr. 243).  On January 19, 2010, plaintiff reported that he had resumed taking his psychiatric medication about three weeks prior to the appointment and that his symptoms were improved (Tr. 238). Plaintiff reported that he took public transportation to the evaluation and to his appointments with Dr. Shpitalnik, but that he would drive only when accompanied by his wife (Tr. 238).  He reported that he was exercising one hour per day, leaving his house occasionally, and was doing some cooking and cleaning (Tr. 239).

On March 12, 2010, Dr. Sass wrote that plaintiff reported that he had started carrying a knife because he was afraid of being attacked, but he had taken public transportation to the appointment was taking public transportation twice a month to see his psychiatrist (Tr. 234).  Plaintiff continued to be unable to drive unless accompanied, but he was running outside most days (Tr. 234).  On May 13, 2010, Dr. Sass wrote that plaintiff reported requiring medication to sleep and that he continued to have low energy and motivation on daily basis (Tr. 230).  Plaintiff had tried to take the subway with his children two weeks earlier, but had had a panic attack, and continued to

16

have anxiety in crowded places (Tr. 230).  His daily activities
included errands outside of his home almost every day, gardening
twice per week, and housework, but he was not socializing (Tr.
231).  Dr. Sass found plaintiff's gross cognitive examination to
be normal with respect to concentration, attention and memory,
and he wrote that plaintiff had a temporary, partial, moderate
psychiatric disability (Tr. 231).  On June 18, 2010 plaintiff
reported that he had tried to see a movie in a theater but that
he had had a panic attack, and he again reported that he was
carrying a knife (Tr. 227).  He was able to eat in restaurants
sometimes, and although Dr. Sass wrote that plaintiff was still
mildly depressed, he found plaintiff's concentration, attention
and memory to be normal (Tr. 227).  Dr. Sass wrote that plaintiff
had permanent, partial, mild psychiatric disability (Tr. 228) and
that he was unable to operate a bus (Tr. 227).

        Plaintiff underwent a psychiatric examination by Dr.
Amy Cohen on December 14, 2010 (Tr. 335-39).  Dr. Cohen found
that plaintiff's concentration and memory were mildly impaired,
but that his insight and judgment were good (Tr. 337-38).
Plaintiff reported that he was able to dress, bathe and groom
himself, and that he split household tasks with his wife (Tr.
338).  Dr. Cohen wrote that plaintiff was able to follow and
understand simple instructions, could perform simple tasks

17

independently and with supervision and could make appropriate decisions, but could not maintain concentration very effectively, likely had a limited ability to learn new tasks, probably could not perform complex tasks and had difficulty relating adequately to others and appropriately dealing with stress (Tr. 338).

On January 27, 2011, Dr. M. Totin opined that plaintiff retained the ability to perform at least simple work in a low contact, low stress setting (Tr. 358).  Dr. Totin found plaintiff had moderate limitations in remembering detailed instructions, concentration, social interaction and adaptation (Tr. 342-43).

D.   Proceedings
     Before the ALJ

Plaintiff testified that he could only drive short distances and could not take public transportation (Tr. 35, 40). He further testified that he had taken public transportation only twice since his assault in 2009 (Tr. 41).  Plaintiff stated that he was never alone with his children (Tr. 56).  He stated that he watched television (Tr. 57) and would go food shopping with his wife and children twice per month (Tr. 60).

Plaintiff testified that he had back pain prior to the assault (Tr. 44-45).  He stated that his back would "lock up" if he moved the wrong way, and that he had two back spasms per day,

each lasting twenty minutes (Tr. 49).  Plaintiff stated that his back made it difficult for him to put his shoes on because he could not bend over, and it also prevented him from sitting for more than thirty minutes at a time (Tr. 65).  He testified that he was taking Percocet for shoulder and back pain and that the Percocet made him drowsy (Tr. 47).  Plaintiff testified that he is right-handed and that he could not write because his hand would go numb (Tr. 38, 65).  Plaintiff testified that he had surgery on his knee, but that his knee still would slip out of place and was weak (Tr. 50-51).  He stated that his knee prevented him from lifting thirty pounds and that he was not receiving any treatment for it (Tr. 51-52).  Plaintiff testified that he was sleeping eight to twelve hours per night with medication (Tr. 61), and that he was not experiencing any panic attacks (Tr. 62).  He also stated that he could not read because he could not concentrate (Tr. 64).

III. <u>Analysis</u>

    A.   Applicable
        <u>Legal Principles</u>

      1.  <u>Standard of Review</u>

      The Court may set aside the final decision of the Commissioner only if it is not supported by substantial evidence or if it is based upon an erroneous legal standard. 42 U.S.C. § 405(g); <u>Selian v. Astrue</u>, 708 F.3d 409, 417 (2d Cir. 2013) (<u>per curiam</u>); <u>Talavera v. Astrue</u>, 697 F.3d 145, 151 (2d Cir. 2012); <u>Burgess v. Astrue</u>, 537 F.3d 117, 127 (2d Cir. 2008).

      The Court first reviews the Commissioner's decision for compliance with the correct legal standards; only then does it determine whether the Commissioner's conclusions were supported by substantial evidence. <u>Tejada v. Apfel</u>, 167 F.3d 770, 773 (2d Cir. 1999); <u>Johnson v. Bowen</u>, 817 F.2d 983, 985 (2d Cir. 1987). "Even if the Commissioner's decision is supported by substantial evidence, legal error alone can be enough to overturn the ALJ's decision," <u>Ellington v. Astrue</u>, 641 F. Supp. 2d 322, 328 (S.D.N.Y. 2009) (Marrero, D.J.); <u>accord</u> <u>Johnson v. Bowen</u>, <u>supra</u>, 817 F.2d at 986, but "where application of the correct legal principles to the record could lead to only one conclusion, there

is no need to require agency reconsideration," <u>Johnson v. Bowen</u>, <u>supra</u>, 817 F.2d at 986.

"'Substantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" <u>Talavera v. Astrue</u>, <u>supra</u>, 697 F.3d at 151, <u>quoting</u> <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971). Consequently, "[e]ven where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings 'must be given conclusive effect' so long as they are supported by substantial evidence." <u>Genier v. Astrue</u>, 606 F.3d 46, 49 (2d Cir. 2010) (<u>per</u> <u>curiam</u>), <u>quoting</u> <u>Schauer v. Schweiker</u>, 675 F.2d 55, 57 (2d Cir. 1982). Thus, "[i]n determining whether the agency's findings were supported by substantial evidence, 'the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn.'" <u>Selian v. Astrue</u>, <u>supra</u>, 708 F.3d at 417, <u>quoting</u> <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1038 (2d Cir. 1983) (<u>per</u> <u>curiam</u>). Where, as here, the claimant has submitted new evidence to the Appeals Council following the ALJ's decision, such evidence becomes part of the administrative record. <u>See</u> <u>Brown v. Apfel</u>, 174 F.3d 59, 62 (2d Cir. 1999) (<u>per</u> <u>curiam</u>); <u>Perez v. Chater</u>, 77 F.3d 41, 45 (2d Cir. 1996).

    2.   Determination
       of Disability

A claimant is entitled to DIB benefits if he can establish an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A); see also Barnhart v. Walton, 535 U.S. 212, 217-22 (2002) (both impairment and inability to work must last twelve months).[17]  The impairment must be demonstrated by "medi-cally acceptable clinical and laboratory diagnostic techniques," 42 U.S.C. § 423(d)(3), and it must be "of such severity" that the claimant cannot perform his previous work and "cannot, consider-ing [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  Whether such work is actually available in the area where the claimant resides is immaterial.  42 U.S.C. § 423(d)(2)(A).

---

[17]The standards that must be met to receive DIB benefits under Title II of the Act are the same as the standards that must be met in order to receive supplemental security income benefits under Title XVI of the Act.  Barnhart v. Thomas, 540 U.S. 20, 24 (2003).  Accordingly, cases addressing the latter are equally applicable to cases involving the former.

In making the disability determination, the Commissioner must consider:  "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience."  Brown v. Apfel, supra, 174 F.3d at 62; DiPalma v. Colvin, 951 F. Supp. 2d 555, 565 (S.D.N.Y. 2013) (Peck, M.J.).

The Commissioner must follow the five-step process required by the relevant regulations.  20 C.F.R. § 404.1520(a)(4)(i)-(v).  The first step is a determination of whether the claimant is engaged in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i).  If he is not, the second step requires determining whether the claimant has a "severe medically determinable physical or mental impairment."  20 C.F.R. § 404.1520(a)(4)(ii).  If he does, the inquiry at the third step is whether any of these impairments meet one of the listings in Appendix 1 of the regulations.  20 C.F.R. § 404.1520(a)(4)(iii). If the answer to this inquiry is affirmative, the claimant is disabled.  20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not meet any of the listings in Appendix 1, step four requires an assessment of the claimant's residual functional capacity ("RFC") and whether the claimant can still perform his past relevant work given his RFC.  20 C.F.R. §

404.1520(a)(4)(iv); see Barnhart v. Thomas, supra, 540 U.S. at
24-25.  If he cannot, then the fifth step requires assessment of
whether, given claimant's RFC, he can make an adjustment to other
work.  20 C.F.R. § 404.1520(a)(4)(v).  If he cannot, he will be
found disabled.  20 C.F.R. § 404.1520(a)(4)(v); see Selian v.
Astrue, supra, 708 F.3d at 417-18; Talavera v. Astrue, supra, 697
F.3d at 151.

RFC is defined in the applicable regulations as "the
most [the claimant] can still do despite [his] limitations."  20
C.F.R. § 404.1545(a)(1).  To determine RFC, the ALJ "identif[ies]
the individual's functional limitations or restrictions and
assess[es] his or her work-related abilities on a function--
by-function basis, including the functions in paragraphs (b),(c),
and (d) of 20 [C.F.R. §§] 404.1545 and 416.945."  Cichocki v.
Astrue, 729 F.3d 172, 176 (2d Cir. 2013) (per curiam), quoting
SSR 96-8p, 1996 WL 374184 at *1 (July 2, 1996).  The results of
this assessment determine the claimant's ability to perform the
exertional demands of sustained work and may be categorized as
sedentary, light, medium, heavy or very heavy.  20 C.F.R. §
404.1567; see Rodriquez v. Apfel, 96 Civ. 8330 (JGK), 1998 WL
150981 at *7 n.7 (S.D.N.Y. Mar. 31, 1998) (Koeltl, D.J.).  This
ability may then be found to be further limited by nonexertional
factors that restrict the claimant's ability to work.  See Butts

v. Barnhart, 388 F.3d 377, 383 (2d Cir. 2004), amended in part on other grounds on reh'g, 416 F.3d 101 (2d Cir. 2005); Bapp v. Bowen, 802 F.2d 601, 605-06 (2d Cir. 1986).

The claimant bears the initial burden of proving disability with respect to the first four steps. Selian v. Astrue, supra, 708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128. Once the claimant has satisfied this burden, the burden shifts to the Commissioner to prove the final step -- that the claimant's RFC allows the claimant to perform some work other than his past work. Selian v. Astrue, supra, 708 F.3d at 418; Butts v. Barnhart, supra, 388 F.3d at 383.

In some cases, the Commissioner can rely exclusively on the Medical-Vocational Guidelines ("the Grid") contained in 20 C.F.R. Part 404, Subpart P, Appendix 2 when making the determination at the fifth step. Gray v. Chater, 903 F. Supp. 293, 297-98 (N.D.N.Y. 1995). "The Grid takes into account the claimant's RFC in conjunction with the claimant's age, education and work experience. Based on these factors, the Grid indicates whether the claimant can engage in any other substantial gainful work which exists in the national economy." Gray v. Chater, supra, 903 F. Supp. at 298; accord Butts v. Barnhart, supra, 388 F.3d at 383.

The Grid may not be relied upon exclusively in cases where the claimant has nonexertional limitations that significantly restrict his ability to work. Butts v. Barnhart, supra, 388 F.3d at 383; Bapp v. Bowen, supra, 802 F.2d at 605-06. When a claimant suffers from a nonexertional limitation such that he is "unable to perform the full range of employment indicated by the [Grid]," Bapp v. Bowen, supra, 802 F.2d at 603, or the Grid fails "to describe the full extent of a claimant's physical limitations," Butts v. Barnhart, supra, 388 F.3d at 383, the Commissioner must introduce the testimony of a vocational expert in order to prove "that jobs exist in the economy which claimant can obtain and perform." Butts v. Barnhart, supra, 388 F.3d at 384 (internal quotation marks and citation omitted); see also Heckler v. Campbell, 461 U.S. 458, 462 n.5 (1983) ("If an individual's capabilities are not described accurately by a rule, the regulations make clear that the individual's particular limitations must be considered.").

B.    The ALJ's Decision

As an initial matter, the ALJ found that plaintiff met the insured status requirements of the Act through December 31, 2014 (Tr. 16).

26

At step one, the ALJ found that plaintiff had not engaged in substantial gainful activity since April 30, 2009 (Tr. 16).

At step two, the ALJ found that plaintiff had severe impairments, including lumbar degenerative disc disease, disc herniations, cervical degenerative disc disease, right shoulder injury, PTSD and depression (Tr. 16). The ALJ found that plain-tiff also had a nonsevere impairment of left knee pain (Tr. 17).

At step three, the ALJ found that plaintiff did not have an impairment, or combination of impairments, that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 (Tr. 17).

At step four, the ALJ found that plaintiff had the RFC

to perform light work as defined in 20 C.F.R. § 404.1567(b)[18] except that he is able to understand, remember and carryout simple, unskilled work[19] related

---

[18]"Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be consid-ered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities." 20 C.F.R. § 404.1567(b).

[19]"Unskilled work is work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time. The job may or may not require considerable strength. For example, we consider jobs unskilled if the primary
(continued...)

> tasks and occasionally can interact with the public.
> In addition, he should avoid operating machinery and
> driving due to the effects and use of pain medication
> and he can frequently can reach overhead with the right
> upper extremity

(Tr. 18).  In making this finding, the ALJ considered plaintiff's

credibility and weighed the medical opinions.

The ALJ found plaintiff's allegations of debilitating

symptoms were not credible because they were inconsistent with

plaintiff's admitted daily activities (Tr. 23).  Specifically,

the ALJ noted, plaintiff told Dr. Sass that he took public

transportation, cared for his children, gardened, exercised one

hour per day, walked, cooked, cleaned and went running (Tr. 23).

At the hearing, however, plaintiff denied engaging in most of

those activities (Tr. 23).  The ALJ also noted that although

plaintiff claimed to have unrelenting pain and problems putting

on his shoes, these symptoms were not reflected in the notes of

plaintiff's treating physicians (Tr. 23).  In addition, the ALJ

stated that the treatment notes showed that plaintiff was travel-

ing to Brooklyn, New York, for treatment, which indicated that

---

[19](...continued)
work duties are handling, feeding and offbearing (that is,
placing or removing materials from machines which are automatic
or operated by others), or machine tending, and a person can
usually learn to do the job in 30 days, and little specific
vocational preparation and judgment are needed."  20 C.F.R. §
404.1568(a).

the plaintiff was able to travel long distances (Tr. 23).  The
ALJ also found that plaintiff had received only conservative
treatment (Tr. 23).

The ALJ gave "little weight" to Dr. Xiao's opinion of
March 28, 2011, which stated that plaintiff could only sit for
one hour and stand or walk for thirty minutes during an eight-
hour day, because Dr. Xiao's treatment notes of March 7, 2011 did
not support such restrictions, and the restrictions were contra-
dicted by plaintiff's daily activities, which included childcare
(Tr. 19-20).  The ALJ also noted that Dr. Xiao recommended
conservative treatment consisting of anti-inflammatory and pain
medication and physical therapy (Tr. 19).

The ALJ accorded "some weight" to Dr. Acuri's opinion
that plaintiff should avoid lifting heavy items and should
maintain good posture because it was consistent with the findings
of his physical exam (Tr. 20).  The ALJ found that the MRI that
Dr. Acuri reviewed, the physical exam he performed, and his
opinion all supported the conclusion that plaintiff had the RFC
to perform light work, with no heavy lifting or prolonged sitting
(Tr. 19-20).

The ALJ found Dr. Rombom's treatment notes to be
inconsistent and vague (Tr. 19).  The ALJ found that although
notes from August 2009 state that plaintiff had a GAF of 45, they

29

also state that there was no evidence of a thought disorder, and a year later the notes report that plaintiff was managing well on medication (Tr. 19).

The ALJ gave only "slight weight" to Dr. Haberman's opinion of December 8, 2011 that plaintiff was unable to concentrate and could no longer work as a bus driver because it was inconsistent with plaintiff's daily activities, such as using public transportation, gardening, running errands and childcare, and with plaintiff's testimony that he watched television and cared for his children (Tr. 22). The ALJ also found that Dr. Haberman's opinion was contradicted by the notes from plaintiff's intake exam on December 7, 2011, which found plaintiff's memory skills, attention and concentration to be intact with no deficiency, and that plaintiff had a GAF of 60 (Tr. 19-20). The ALJ found that these notes supported plaintiff's ability to perform at least simple, unskilled work (Tr. 20).

The ALJ gave "some weight" to Dr. Wilson's opinion that plaintiff had no limitations on his ability to work aside from those imposed by pain medication because it was consistent with Dr. Wilson's objective examination, which tested plaintiff's strength, reflexes and range of motion and because Dr. Wilson reviewed additional medical records before completing the opinion (Tr. 20). The ALJ found that Dr. Wilson's opinion supported the

conclusion that plaintiff had the RFC to perform light work (Tr. 20).

The ALJ also gave "some weight" to Dr. Bessen's opinion that plaintiff could push, pull and lift up to thirty pounds but should avoid twisting, climbing and operating machinery or vehicles because it was consistent with Dr. Bessen's objective examination and with a preponderance of the medical evidence in the record (Tr. 21).  The ALJ found that Dr. Bessen's opinion also supported the conclusion that plaintiff had the RFC to perform light work with some limitations on overhead reaching with the upper right extremity, operating machinery and driving (Tr. 21).

The ALJ gave only "slight weight" to Dr. Lopez's opinion that plaintiff could work but could not perform twisting or climbing activities, could not lift, pull or push weight greater than ten pounds and could not perform work involving heights or operating vehicles or mechanical equipment because it was conducted about one month after plaintiff's assault (Tr. 21).

The ALJ gave "little weight" to Dr. Hearns' opinion that plaintiff was 80% disabled because it was not specific, not supported by treatment notes and not supported by a preponderance of the medical evidence (Tr. 21).

31

The ALJ gave "some weight" to Dr. Malhotra's opinion that plaintiff had mild limitations on his ability to turn his neck and moderate limitations on his ability to bend and to raise his right arm above shoulder level because it was based on a thorough examination (Tr. 21).  The ALJ noted that Dr. Malhotra found no instability, loss of sensation or weakness in plaintiff's right shoulder (Tr. 21).  The ALJ wrote that Dr. Malhotra's opinion also supported the conclusion that plaintiff had the RFC to perform light work with limitations on reaching overhead with the right upper extremity (Tr. 21).

The ALJ reviewed Dr. Sass's reports, which stated that plaintiff had some limitations with his activities of daily living and could not travel long distances (Tr. 21).  The ALJ noted that in January 2010, Dr. Sass wrote that plaintiff was able to care for his children, was sleeping seven hours per night, could travel to the exam by public transportation, exercised one hour per day, did some housework and walked outside (Tr. 21).  Dr. Sass reported that plaintiff still claimed he had difficulty reading but found that plaintiff had good, gross cognitive abilities (Tr. 21).  The ALJ noted that plaintiff continued to improve as indicated by Dr. Sass's report of March 2010, in which Dr. Sass stated plaintiff could take public transportation to Dr. Shpitalnik and was cooking, cleaning and

32

running (Tr. 21).  Dr. Sass wrote that plaintiff's daily activi-
ties were improving but that plaintiff was still experiencing
social limitations (Tr. 21).  Dr. Sass noted that plaintiff had
fewer nightmares but that he still had difficulty with concentra-
tion (Tr. 21).  The ALJ noted that in May 2010, plaintiff still
had depressive symptoms and avoided crowded environments but was
able to perform the activities of daily living, and that Dr. Sass
had opined that plaintiff had temporary, partial, moderate
disability (Tr. 22).

          The ALJ gave "some weight" to Dr. Sass's opinion, as
expressed in his final evaluation, that plaintiff should not
drive a bus and had a permanent, partial, mild psychiatric
disability because it was not very specific (Tr. 21).  The ALJ
wrote that plaintiff's examinations and his activities of daily
living supported the conclusion that plaintiff could do simple,
unskilled work and could occasionally interact with the public,
but should avoid operating machinery and driving (Tr. 21).

          The ALJ gave "some weight" to Dr. Totin's opinion that
plaintiff could perform simple work in a low contact setting, but
concluded that the moderate limitations Dr. Totin found with
respect to plaintiff's activities of daily living were not
supported by other evidence in the record, citing as examples the
activities described by Dr. Sass (Tr. 22).

The ALJ gave "limited weight" to Dr. Cohen's opinion that plaintiff could not maintain concentration because it was not consistent with her own findings and not well supported by a preponderance of the evidence (Tr. 22).  Dr. Cohen wrote that she found plaintiff's concentration and memory to be mildly limited and then expressed an opinion that plaintiff was not able to maintain concentration (Tr. 22).

The ALJ found that plaintiff had past relevant work as a bus driver and that plaintiff could no longer perform that work (Tr. 23).

At step five, the ALJ did not assess the transferability of plaintiff's job skills because the Grid would direct a finding of "not disabled" whether or not plaintiff's skills were transferable (Tr. 23).  The ALJ found that plaintiff could perform work that existed in significant numbers in the national economy because he had the RFC to perform substantially all of the exertional demands for the full range of light work (Tr. 23-24).  The ALJ found that plaintiff's additional limitations had little or no effect on the occupational base of unskilled light work and that therefore, given plaintiff's age, education and

34

work experience, plaintiff was not disabled under Grid Rule
202.21 (Tr. 24).[20]

      C.    Analysis of the
           ALJ's Decision

      Plaintiff argues that the ALJ's decision was not
supported by substantial evidence (Plaintiff's Memorandum of Law
in Support of Plaintiff's Motion for Summary Judgment, dated
March 17, 2014 (Docket Item 13) ("Pl.'s Mem.") at 3-6).  Plain-
tiff appears to contest only the ALJ's determination at step four
of the disability analysis.  Specifically, plaintiff contends
that the ALJ misinterpreted the opinions of certain physicians
and incorrectly failed to credit plaintiff's testimony regarding
his symptoms and limitations (Pl.'s Mem. at 3-6).  Plaintiff
argues that the evidence supports a finding that plaintiff lacks
the RFC to perform even sedentary work and is therefore disabled
(Pl.'s Mem. at 6).

------

[20]Grid Rule 202.21 applies to an individual who the RFC to
perform only light work, is 45-49 years old, graduated from high
school and has non-transferable skills from prior skilled or
semiskilled work experience.  20 C.F.R. Pt. 404, Subpt. P, app.
2, § 202.21.  Although it appears that plaintiff has some non-
exertional limitations, plaintiff does not raise any arguments
regarding the ALJ's failure to solicit testimony from a voca-
tional expert.

After reviewing the record, I find that the ALJ's RFC determination is supported by substantial evidence. While there is conflicting evidence in the record, "[i]t is the function of the [Commissioner], not [the reviewing courts], to resolve evidentiary conflicts." Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983); accord Genier v. Astrue, supra, 606 F.3d at 49. Because I find evidence that a "reasonable mind might accept as adequate to support a conclusion" that plaintiff is not disabled, see Talavera v. Astrue, supra, 697 F.3d at 151, quoting Richardson v. Perales, supra, 402 U.S. at 401, I recommend that the ALJ's decision be affirmed.

### 1.   Physical Limitations

As the ALJ noted (Tr. 19-22), the conclusion that plaintiff could perform light work is supported by several of the physician opinions.  The ALJ cites Dr. Acuri's finding, based on an exam and an MRI, that plaintiff's gait was normal but that plaintiff should avoid heavy lifting and prolonged sitting (Tr. 19).  The plaintiff's ability to perform light work is also supported by Dr. Bessen's exam that found, as early as late 2009, that plaintiff was able to lift and carry up to thirty pounds. Dr. Malhotra's exam and opinion both support the conclusion that plaintiff could perform light work with limits on overhead

reaching.  While Dr. Malhotra opined that plaintiff had mild limitations in his ability to turn his neck and had moderate limitations in lifting his right arm above shoulder level, Dr. Malhotra also found that plaintiff had no instability, intact sensation and 5/5 strength in his right shoulder (Tr. 21).  That plaintiff could perform light work is also supported by Dr. Wilson's opinion from 2010 that plaintiff had excellent muscle mass and only a mild limitation on his shoulder's range of motion (Tr. 20).  Dr. Wilson found that plaintiff had no restrictions with respect to work aside from those resulting from pain medica-tion.  Plaintiff's physical ability to perform light work was also supported by his reported daily activities, which included cooking, cleaning, running, shopping, walking, gardening and caring for his young children (Tr. 21-22).

a.   Dr. Wilson

Plaintiff argues that the ALJ relied "heavily" on Dr. Wilson's opinion in finding that plaintiff was capable of light work and that such reliance was erroneous because Dr. Wilson conducted only a single examination of plaintiff, and his opinion should therefore be accorded only limited weight (Pl.'s Mem. at 4).

37

Contrary to plaintiff's contention, the ALJ did not rely "heavily" on Dr. Wilson's opinion.  As detailed above, the ALJ gave "some weight" to Dr. Wilson's opinion and stated that his opinion supported the conclusion that plaintiff had the RFC to perform light work.  While the ALJ did take Dr. Wilson's opinion into account in determining plaintiff's RFC, he also assessed the opinions of ten other physicians, giving six "some weight" and the other four slight, limited or little weight.  In addition, he considered plaintiff's treatment notes and exams, as well as plaintiff's subjective symptoms.  While a single physical examination, such as Dr. Wilson's, should not be accorded substantial weight, see Cruz v. Sullivan, 912 F.2d 8, 13 (2d Cir. 1990) ("[I]n evaluating a claimant's disability, a consulting physician's opinions or report should be given limited weight."), there is no indication that the ALJ relied heavily on or fully accepted Dr. Wilson's opinion.  For example, Dr. Wilson opined that plaintiff had no work restrictions except those imposed by his pain medication.  The ALJ, in contrast, found that plaintiff had several additional limitations on his capacity to work.

Thus, plaintiff's contention that the ALJ gave undue weight to Dr. Wilson's opinion is belied by the record.

38

        b.   Dr. Xiao

        Plaintiff argues that the ALJ should have accorded
controlling weight to the opinion of Dr. Xiao, plaintiff's
treating physician, because it was supported by medical evidence
and not contradicted by substantial evidence in the record (Pl.'s
Mem. at 4).

        A treating physician's opinion will be given control-
ling weight if it is "well-supported by medically acceptable
clinical and laboratory diagnostic techniques and is not incon-
sistent with the other substantial evidence in . . . [the]
record."  20 C.F.R. § 404.1527(c)(2); Selian v. Astrue, supra,
708 F.3d at 418; Burgess v. Astrue, supra, 537 F.3d at 128;
Green-Younger v. Barnhart, 335 F.3d 99, 106-07 (2d Cir. 2003).
"Although the treating physician rule generally requires defer-
ence to the medical opinion of a claimant's treating physician,
the opinion of the treating physician is not afforded controlling
weight where . . . [it is] not consistent with other substantial
evidence in the record . . . ."  Halloran v. Barnhart, 362 F.3d
28, 32 (2d Cir. 2004) (citation omitted); accord Rosier v.
Colvin, No. 13-4490-CV, 2014 WL 5032325 at *2 (2d Cir. Oct. 9,
2014) (summary order).

                            39

Here, the ALJ gave "little weight" to Dr. Xiao's opinion dated March 28, 2011 because it stated that plaintiff had limitations that were more severe than those Dr. Xiao found just three weeks earlier (see Tr. 19-20).  The ALJ wrote that while Dr. Xiao's notes dated March 7, 2011 state that plaintiff should avoid prolonged sitting, standing and walking, her opinion dated March 28, 2011 limited plaintiff to a maximum of thirty minutes of walking and one hour of sitting per eight-hour day (Tr. 19).  The ALJ also found Dr. Xiao's opinion dated March 28, 2011 conflicted with plaintiff's reported activities of daily living, which included childcare (Tr. 20).  In addition, the ALJ noted that Dr. Xiao prescribed only conservative treatment for plain- tiff's injuries (Tr. 19).

Plaintiff argues that Dr. Xiao's reports "have regu- larly noted that [plaintiff] is unable to stand for more than . . . 30 minutes total in an 8 hour work day, and unable to sit for more than . . . 1 hour total" (Pl.'s Mem. at 5).  Only one of Dr. Xiao's reports contains that statement.  The other documents that plaintiff cites are treatment notes, which indicate that plaintiff should avoid prolonged sitting, standing or walking. These same notes also recommend an exercise program, physical therapy and chiropractic treatment.  In addition, there are no other opinions that even approach Dr. Xiao's opinion of March 28,

2011 that seems to imply that plaintiff is almost totally incapa-
ble of moving.

　　　　Under these circumstances, it was permissible for the
ALJ to decline to give Dr. Xiao's March 28, 2011 opinion control-
ling weight.  See Cruz v. Sullivan, supra, 912 F.2d at 13 ("[T]he
'[r]esolution of genuine conflicts between the opinion of the
treating source, with its extra weight, and any substantial
evidence to the contrary remains the responsibility of the
fact-finder.'"), quoting Schisler v. Bowen, 851 F.2d 43, 47 (2d
Cir. 1988).

　　　　　　　　c.　Dr. Hearns

　　　　The nature of plaintiff's argument concerning Dr.
Hearns is not clear, but plaintiff does state that Dr. Hearns'
opinion supports a finding of disability (Pl.'s Mem. at 5).

　　　　The ALJ considered Dr. Hearns' opinion but gave it
little weight because it was vague and unsupported.  This deter-
mination is supported by substantial evidence -- Dr. Hearns'
opinion is limited to a conclusory statement of the extent to
which he found plaintiff to be disabled, unaccompanied by any
explanation.  Dr. Hearns' notes from his exams of plaintiff in
May and June 2011 are also vague and contradictory:  they state
that plaintiff has a "marked" disability, but indicate that

41

plaintiff is limited only with respect to pulling, pushing and lifting.  In addition, Dr. Hearns does not appear to have re-viewed or performed any diagnostic tests.  In view of the limited bases for Dr. Hearns' opinion and the lack of an explanation for the opinion, the ALJ did not err by according Dr. Hearns' opinion only little weight.

## 2.  Psychiatric Limitations

The ALJ's RFC determination that plaintiff was limited to performing unskilled work with only occasional interaction with the public is also supported by substantial evidence.

As the ALJ noted, Dr. Haberman's intake assessment in December 2011 found plaintiff had no deficiency in concentration. While Dr. Sass reported that plaintiff had difficulty socializing with friends and anxiety in crowded environments, he also re-ported that plaintiff had normal concentration and memory (Tr. 21-22).  Dr. Totin found that plaintiff had moderate restrictions in his social functioning and concentration but could perform simple work in a low contact setting (Tr. 22).  Dr. Cohen con-cluded that plaintiff was not able to maintain concentration and had difficulty relating to others, but during her exam, she found plaintiff's concentration and memory skills were only mildly limited.

42

In addition, plaintiff's ability to perform unskilled work with limited interaction with the public is supported by the daily activities that he reported to his physicians and his testimony that he performed childcare and watched television shows (Tr. 22). This evidence supports the ALJ's finding that although plaintiff had some limitations on his concentration and ability to interact with the public, plaintiff could, neverthe-less, engage in unskilled work with only occasional interaction with the public. See Bartell v. Comm'r of Soc. Sec., 5:13-CV-843 (GLS)(ESH), 2014 WL 4966149, at *3 (N.D.N.Y. Sept. 30, 2014) ("[V]arious courts have held that when medical evidence demon-strates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, limiting a claimant to only unskilled work sufficiently accounts for such limitations."); see also SSR 85-15, 1985 WL 56857 at *4 (Jan. 1, 1985) ("[Unskilled] jobs ordinarily involve dealing primarily with objects, rather than with data or peo-ple.").

a. Dr. Sass

Plaintiff argues that the ALJ incorrectly interpreted Dr. Sass's opinions as showing that plaintiff's condition was

improving when in fact Dr. Sass's opinions show plaintiff's condition had worsened (Pl.'s Mem. at 3).

Plaintiff contends that Dr. Sass's final evaluation concludes that plaintiff's anxiety had worsened, citing as evidence the fact that plaintiff had started to carry a knife (Pl.'s Mem. at 3). However, Dr. Sass's overall opinion, as the ALJ correctly noted, was that plaintiff's condition had improved -- in his penultimate opinion, Dr. Sass opined that plaintiff suffered from a moderate disability, while in his final report, he opined that plaintiff suffered from a mild disability. The ALJ also found that the detailed notes that Dr. Sass took at each exam showed that plaintiff's daily activities had increased, even though plaintiff continued to exhibit some symptoms of depression. Contrary to plaintiff's contention, the ALJ did not "cherry pick" from Dr. Sass's notes. In addition to plaintiff's increased daily activities, the ALJ also cited Dr. Sass's notes as showing that plaintiff continued to experience social limitations, symptoms of depression, and anxiety in crowded environments. Consequently, the ALJ did not misinterpret Dr. Sass's reports.

44

b.   Dr. Haberman

Plaintiff appears to argue that the ALJ incorrectly construed Dr. Haberman's treatment notes as supporting the conclusion that plaintiff had no deficiency in concentration because Dr. Haberman's opinion dated the following day states that plaintiff was "unable to concentrate" (Pl.'s Mem. at 5).

The ALJ's assessment was more nuanced than plaintiff suggests.  The ALJ found a contradiction between the detailed notes from plaintiff's intake exam conducted in Dr. Haberman's office on December 7, 2011 and Dr. Haberman's brief opinion dated December 8, 2011 (Tr. 19-20).  The notes from Dr. Haberman's December 7, 2011 intake exam state that plaintiff's attention and concentration were intact, with no deficiency.  By contrast, Dr. Haberman's opinion dated the following day found plaintiff "unable to concentrate" (Tr. 413).  The ALJ accorded the opinion of December 8, 2011 only "slight weight" because he found it inconsistent with the daily activities that plaintiff reported to Dr. Sass and testified to at the hearing, which included child-care and watching television (see Tr. 19-20, 22).  The ALJ did not find that plaintiff had no deficiency in concentration -- the physicians' opinions that plaintiff had some limits with concen-tration and interacting with the public were considered in

45

determining plaintiff's RFC, as evidenced by plaintiff's being
limited to unskilled work and only occasional interaction with
the public.

The ALJ's assessment of Dr. Haberman's opinion is also
consistent with Dr. Haberman's report of November 30, 2011, which
found that although plaintiff had difficulty interacting with the
public, he had a "good" ability to function independently and
understand, remember and carry out simple instructions (Tr. 387-
88).  In addition, Dr. Haberman's notes from June and September
2011 found that plaintiff was doing well on medication.

Accordingly, the ALJ did not err when he stated that
Dr. Haberman's notes dated December 7, 2011 found plaintiff's
concentration intact or when he gave only limited weight to Dr.
Haberman's opinion of December 8, 2011.

3.    Plaintiff's
      Credibility

Plaintiff also argues that the ALJ should have credited
his testimony at the hearing concerning the nature and severity
of his symptoms and limitations (Pl.'s Mem. at 5-6).

> When determining a claimant's RFC, the ALJ is required
> to take the claimant's reports of pain and other limi-
> tations into account, 20 C.F.R. § 416.929; see
> McLaughlin v. Sec'y of Health, Educ. & Welfare, 612
> F.2d 701, 704-05 (2d Cir. 1980), but is not required to
> accept the claimant's subjective complaints without

question; he may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record.  Marcus v. Califano, 615 F.2d 23, 27 (2d Cir. 1979).

The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations.  At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged.  20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability.  20 C.F.R. § 404.1529(a).  If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record.  Id.  The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the agency] during interviews, on applications, in letters, and in testimony in [its] administrative proceedings."  20 C.F.R. § 404.1512(b)(3); see also 20 C.F.R. § 404.1529(a); S.S.R. 96-7p.

Genier v. Astrue, supra, 606 F.3d at 49.

As described at pages 28-29 above, the ALJ performed a credibility analysis and found that plaintiff was not entirely credible because his testimony conflicted with his statements to his physicians.  As the ALJ noted, while plaintiff testified to a complete inability to take public transportation, care for his children by himself or be active, his physicians reported that plaintiff was taking public transportation regularly, caring for

his children and running, walking, gardening, and doing errands and housework.

Thus, to the extent the ALJ's RFC findings rested on his determination of plaintiff's credibility, it was "within the discretion of the [Commissioner] to evaluate the credibility of plaintiff's complaints and render an independent judgment in light of the medical findings and other evidence regarding the true extent of such symptomology." Gernavage v. Shalala, 882 F. Supp. 1413, 1419 (S.D.N.Y. 1995) (Leisure, D.J.); accord Cichocki v. Astrue, 534 F. App'x 71, 75 (2d Cir. 2013) (summary order), citing Carroll v. Sec'y of Health & Human Servs., 705 F.2d 638, 642 (2d Cir. 1983) ("It is the function of the [Commissioner], not [the reviewing courts], . . . to appraise the credibility of witnesses, including the claimant.").

IV.  Conclusion

Accordingly, for all the foregoing reasons, I respectfully recommend that the plaintiff's motion for summary judgment be denied and the Commissioner's motion for judgment on the pleadings be granted.

V.   <u>Objections</u>

          Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from receipt of this Report to file written objections.  <u>See</u> <u>also</u> Fed.R.Civ.P. 6(a).  Such objections (and responses thereto) shall be filed with the Clerk of the Court, with courtesy copies delivered to the Chambers of the Honorable Laura T. Swain, United States District Judge, 500 Pearl Street, Room 1320, and to the Chambers of the undersigned, 500 Pearl Street, Room 750, New York, New York 10007.  Any requests for an extension of time for filing objections must be directed to Judge Swain.  FAILURE TO OBJECT WITHIN FOURTEEN (14) DAYS **WILL** RESULT IN A WAIVER OF OBJECTIONS AND **WILL** PRECLUDE APPELLATE REVIEW. <u>Thomas v. Arn</u>, 474 U.S. 140, 155 (1985); <u>United States v. Male Juvenile</u>, 121 F.3d 34, 38 (2d Cir. 1997); <u>IUE AFL-CIO Pension Fund v. Herrmann</u>, 9 F.3d 1049, 1054 (2d Cir. 1993); <u>Frank v. Johnson</u>, 968 F.2d 298, 300 (2d Cir. 1992); <u>Wesolek v. Canadair</u>

Ltd., 838 F.2d 55, 57-59 (2d Cir. 1988); McCarthy v. Manson, 714

F.2d 234, 237-38 (2d Cir. 1983) (per curiam).

Dated:  New York, New York
        January 13, 2015

                              Respectfully submitted,


                              _____
                              HENRY PITMAN
                              United States Magistrate Judge


Copies transmitted to:


Joseph A. Romano, Esq.
703 Yonkers Avenue
Yonkers, New York 10704

Susan D. Baird, Esq.
Unites States Attorney's Office
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Tomasina Digrigoli, Esq.
Social Security Administration
Office of The General Counsel
26 Federal Plaza, Room 3904
New York, New York 10278